The second case, 22-10441 Myrick v. Fulton County. We have Mr. Harper here for the appellants Mr. Harper, whenever you're ready. No hurry. Good morning. Michael Harper on behalf of April Myrick involved in this tragic case involving the death of Antonio May. May it please the Court, the most glaring error, we believe, from the trial court was to grant a summary judgment to the NAP care defendants. Medical malpractice in Georgia is a classic case for a jury to decide when you have competing experts and their opinions regarding proximate cause and standard of care. In this case, the trial court did not decide on the issue of foreseeability. The trial court just basically said there was a confrontation between Antonio May and the officers and that intervention alone broke probable cause. But the case law clearly states that the judge should also consider foreseeability. And the plaintiff's expert in this case, Dr. Hughes, clearly testified that the altercation was foreseeable if Antonio May was not treated with these issues of substance abuse and mental health. I want to make sure that the Court is aware of that. That's the most glaring error that we believe the trial court. Can you tell me the best part of Dr. Hughes' either his report or his testimony that points to that fact that you just articulated? Absolutely. Dr. Hughes testified that the fact that Travis Williams defended and the other NAP care defendants were aware that Antonio May's intake told them that he was They tested him, actually, for substances, and he was on amphetamines. They knew this when he first arrived at the jail. He went untreated until this confrontation happened. There were hours in between time where Dr. Hughes said he could have been sedated and he could have been treated. And had that happened, they would have avoided the confrontation. He testified, in other words, as I understand his report, and correct me if I'm wrong, and I'm looking at docket entry 218-8, what he said in his report was that the clinicians, this NAP care, could anticipate or be anticipatory of the possibility of deterioration and agitation and or violent detainees that are intoxicated with meth. Absolutely correct. In other words, those with meth, a doctor should know that there's a possibility of a confrontation, right? Absolutely right. If he goes untreated, yes. As I understand his deposition testimony, and this is at 1213-15 at 131, that he testified that, quote, that there was, quote, a point where there has to be a use of force, that there could be deterioration to the point where there's a use of force, including chemical agents and electrical weapons. In other words, that a doctor needs to understand that there is, doctors should understand that there could be deterioration to the point of using those very things. Is that correct? Yes, and Dr. Hughes is a correctional expert. He was a medical director at a jail, and so he has the experience to know this. And for the trial court to just say that this intervening act happened without even considering Dr. Hughes' opinion about foreseeability goes against the law in the case that was cited, the Jordan case, which clearly says that foreseeability is a factor involving breaking proximate cause. Now, that's for the NAPCAR. For the officer defendants, the most troublesome decision there was Officer Cook. Officer Cook began the entire confrontation with Antonio May. Officer Cook testified in the immediate after the incident statement. He did not mention anything about Antonio May stepping toward him. But is that inconsistent? In other words, omissions can be inconsistencies and certainly can be a basis for impeachment sometimes. But when you give an initial report a few days after an incident and then sit down much later for a 200-page deposition, one is inherently going to be less specific than the other. You would agree? There's one thing to say it's less specific, but this is the most crucial element of this I guess the problem is you and I understand this is a really critical fact. In fact, we're here talking about this as being a critical fact, and I agree with you. But an officer or a non-lawyer giving a report afterwards isn't thinking about litigation. They're just laying out here is here's this hour and a half thing that happened that I was involved in and here's, as I remember it, how it came out in some sort of summary fashion. Let me put it this way. In the criminal cases, you often get a 302 or report from an agent and that report lays out an interview of a suspect or what the agent did. But it's understood that that is not a word-for-word transcript of what happened. It's understood that that's not a detailed tick-tock, like a video would be, of exactly what happened on a given minute. And we generally don't use those as a basis to assume that that omission somehow impeaches the entire credibility of a particular witness. But I would argue the exact opposite. I would argue that a well-rehearsed and coached deposition, when you have lawyers telling you what to say, is much less credible than your own words after the incident happens. These lawyers are great. They know what to tell the, I would say they would tell them a lie, but they certainly know how to coach their officers to say, look, if that guy approached you, if he went toward you first, then he initiated a confrontation. That's called resistance. What about all the other officers who testified? None of them testified. From my understanding, Officer Cook was the only one. He was in there first. Okay. So let's, I want to explore that. So let's talk about Officer Jackson because I So I'm looking at docket entry 209-6 at pages 10 and 11. Those are the CMECF pages. There, it's the attorney who's doing the deposition starts off. So Officer Jackson, at the time the cell door opened, we left off at Officer Cook gave the command for Mr. May to back up and put his clothes on, and he refused. Is that right? Answer, yes, ma'am. Okay. What happened next? And then he testifies. Well, after that, Mr. May tried to come to toward Mr. Officer Cook as if he was trying to leave, get out of the cell. And at that point is when Officer Cook that first deployed his first taser cartridge striking Mr. May. Well, that his testimony contradicts the video evidence in the case. I implored the court to look at the video that we filed with the court that shows Mr. Cook went in by himself. The problem is, though, counsel, and I've watched the video. I watched all the videos here, unfortunately. I've watched all the videos here. It's a tragic case. It's hard to see what's seen. We all, there's not anyone in this room who doesn't feel that way. But the video doesn't show what happened inside the cell. That's the problem here. And I know that's part of your point. They should have been wearing the body cams, but The body cameras, they're violating the policy with the body cameras. The flight decision says you have to be careful about self-serving. I filed that case late, but I hope you guys could appreciate the content of it. But the courts have to be careful about a self-serving officer's statement when he really is the only witness. I did read the case, and thank you for filing it in advance. As I understand, though, the D.C. Circuit to be saying, in a case of one-to-one, officer does something that causes the death of, in that case, I think it was an arrestee, you can't just take the officer's word because the only other witness who would have given contrary testimony is not there, so you need to be more cautious. That's not quite what we have here for two reasons. One is the issue that we're talking about, what Officer Cook did, the taser, that didn't cause the death here. I mean, the death happened an hour and a half later after a ton of violence happened. That's number one. And then number two is even more relevant, this is not a one-to-one case. We have ten officers who saw this. We have video of at least part of the incident. But let me address the most important part, because I have limited time, which is the reason that we could not find any case law that warned officers, as far as qualified immunity is concerned, about restraints. No one has ever done this. These officers were trained to not use additional restraints on an inmate, and if you do so, you could kill them. What do we do with the — so, as I understand, and I think you pinpointed, the claim here is not the use of the restraint chair itself, but the use of the restraint chair with the additional — Lots of case law. I could cite to you, but I won't waste your time. But we have lots of case law which says that the use of restraints, handcuffs, is a de minimis use of force, inherently. What do we do with that case law that putting handcuffs on somebody or restraining them is itself de minimis use? Well, I think it's different when the officers testified and the jail policy says that the to restrain an inmate. And so the inmate did not break through the restraints. Why add the waist chain, which compromises breathing? That was the excessive force part, right, that no reasonable officer would do. They added additional restraints. They were trained that if you do that, that could cause death, and that was the actual cause of death. But the trick is, it seems to me, on qualified immunity, to Judge Luck's point, is that if you've already got this batch of cases that says that — we'll call them ordinary restraints — are de minimis, and you've got no case that says that additional restraints violate the Constitution, you might have — you know, you've got an argument that they violate jail policy, but no case that they violate the Constitution, it's a — and, you know, we've got this obvious clarity exception that exists for truly extraordinary cases. But if you've got to kind of like finagle this case into that pigeonhole, it's difficult, especially given the starting point that ordinary restraints are okay. No, I understand the reasoning, but this Court, in the trial court, and in this Court of Appearance, would set a very, very dangerous precedent that officers can violate their own policies that they know will lead to death by doing extraneous force. I just can't see that this could be a reasonable use of force, that we will accept that, that you're able to use force that you know will cause death. Antonio May was already restrained. We could even argue that he wasn't resisting, right? They said he was resisting. How could he resist if he's already in a restraint here that is designed to restrain him, that was restraining him? So it wasn't necessary to add — how about that legal argument, right? There was no — there is no resistance here, right, because he's already restrained. I think logic would — that may be the better argument than what you guys are addressing as far as the de minimis handcuffs and adding extra restraints. So the other point that — with Kenesia Strouder, there's conflicting testimony in this one about — Officer Copeland testified that Antonio May was not trying to grab her handcuffs. Just to be clear, did he say that she — that he wasn't trying to grab her handcuffs or that he didn't see him trying to grab her handcuffs? Those two things are different, I think. Well, I understand the distinction. I mean, if he's in the room, if he's involved in this confrontation, you think if it happened, he would have saw it? I completely understand the Court's question. Yes, he did say he didn't see, but — Even if there's a conflict, though, what he did say is he agreed that there was a struggle going on with Officer Strouder, correct? Yes, there was a struggle. The district court said this, so I'm not making a point that's new. What does it matter about the handcuffs if he's continuing to struggle at the point of her trying to put restraints on him? This is not the restraint chair. This is actually the leg and the waist chains. Right. Isn't she allowed to use some force? Now, whether the punches are too much is a different story, but isn't she allowed to use some force on that boy? Well, she was punching him repeatedly, and that seemed excessive. Four times, right? Yes. If you have other officers already that are restraining him, she ran in from the outside, wasn't even involved. We didn't just start pommeling the guy. That just seemed excessive when there was no clear way to know if that was necessary when you have five other officers that are already trying to restrain him. The other point I want to make in my time here is the sheriff was dismissed, as the court is aware, on the motion to dismiss based on the Monell decision, because the trial court wanted us to cite specific policies that the sheriff had, and we did not have a booking page number of the policy, right? The Monell decision does not require a specific booking page number. Monell just says you have to cite policies that was promulgated by the sheriff that contributed to the death, and we feel like here, there was a lot of miscommunication going on, right? NAPCUR did not inform the officers about Attorney O'Meara's condition. Officers didn't know about his condition. The sheriff should have had a policy that if someone is in this jail, and they're suffering from substance abuse, and they have mental health issues, inform the officers. They all testified. No one told them. There should have been a policy in place, and that was listed in the complaint. It was dismissed because I guess we didn't have a booking page number of the actual specific policy. I don't think Monell requires that. Can I ask you one question? I know that your time has expired, but I've got a question for you that I think we asked both sides be prepared to discuss. You haven't talked about the deliberate indifference claim in this case, and I don't want to sort of open up the door for you to go on at length about it, but do you think you're aware now, anyway, of this divergence in our precedent about gross negligence and mere negligence? Do you think that that standard, that matters for this case? I think it definitely matters, and I believe the court's going to do this on a case-by-case basis, but I believe it should, it should not be in this context where you have officers who are literally watching a man die, who put him in front of a camera so that he could be seen not dying, but what they testified to. We actually ended up dying on camera. The gross negligence standard should not apply. That was deliberate indifference. This may have been tased and beaten and pepper-sprayed, and as opposed to taking him directly to the medical director, they put him in front of a camera to show that he's alive. So within that context, I don't think gross negligence should apply. I think it should be the more negligent standard. I mean, I guess there are two different things going on here. One is like what's the applicable standard, and if the applicable standard is gross negligence, you know, maybe you're saying I might lose that case, but if the standard is mere negligence, you're losing that case. Well, clearly, I would argue for mere negligence in that case. Yeah. But I do think that mere negligence, I would even argue that that's gross negligence, right? I mean, to not take him directly to the medical director and then put him in front of a camera on purpose to show that he's still alive, we didn't do anything wrong, and the guy goes dead. Your point is it meets both standards? Yes. Yes. Okay. Yes. Okay. Very well. Thank you so much. You've got your full rebuttal time because we carried you beyond your allotted opening. Thank you very much. Thank you very much. All right. So, Ms. Woodward, are you up first? Very well. Good morning. May it please the Court, I'm Karen Woodward on behalf of the Sheriff and the defendant officers in this matter, which involves two claims against the officers, excessive force, and as we've been discussing, deliberate indifference. Yesterday, a supplemental authority letter was filed regarding a DC Circuit case, Fife versus District of Columbia, and I brought a case that I did not cite previously that I thought might be of assistance. May I approach? You can just give us the citation. We can look it up. Okay, sure. It is, excuse me, it's Hinson versus Bias, and it is an 11th Circuit case, 927 F 3rd 1103. It's a 2019 case. CERT was denied in the case. Hinson, though, seems to, I read Hinson, Hinson seems to adopt at Fife standard, does it not? Well, I think in Hinson, it talks about the court must accept as true all evidence the officers have submitted that the plaintiff does not contest and that the plaintiff's evidence does not contradict. Here's what we said, quoting from Fife and citing it. We would not want to reward an officer for unlawfully engaging in actions that rendered the arrestee unable to rebut the officer's version of events so that the, I'm using the plaintiff instead of the actual name, so that the plaintiff cannot personally rebut the officer's story does not mean that we must necessarily accept the officer's version of events. Rather, we must carefully examine all the evidence in the record to determine whether the officer's story is internally consistent and consistent with other known facts, where circumstantial or other evidence, if believed, would tend to discredit the police officer's story or where such an officer acted unreasonably. We do not simply accept the officer's account. Instead, where the circumstantial evidence supports a dispute of material fact, we must conclude that summary judgment is inappropriate and allow the case to proceed to trial, right? Correct. But in that case, it looks like a case he would have submitted to us, right? He did. Well, he did. And that's ours. That's our citation of life. And, of course, Henson is an 11th Circuit case. But in that case, the video showed the incident. There was witness testimony about the incident, and we don't have that in this case. So, counsel, let me fast forward a little bit. Here, as I understand it, you're opposing counsel cites four facts to us that establish this circumstantially, that what the officers say should not be believed. And maybe there are more, but this is how I read what he's arguing. Number one, there should have been body camera, and there wasn't. Number two, Officer Jackson's testimony was inconsistent. Number three, Officer Cook did not mention at the time of the omission. And number four, I forget what number four is in the moment, but I'll look it up. Maybe it's that the taser hit him in the back. Thank you. That's exactly what it is. The taser hit him in the back. Thank you. I disagree with each of those, as you discussed. Well, the taser did hit him in the back. I mean, that's a fact. Yes, yes. But we all know that when these sorts of incidents happen, they're fluid. And so, by the time the probes go out and they strike a projected target, I don't think that where it ends is indicative of anything. Well, but are you saying that no reasonable jury could conclude otherwise? Given the facts that Judge Luck has put before you? It's not reasonable to overcome the testimony about what happened and whether it was objectively reasonable, the fact that it struck him in the rear. I mean, it wasn't in the back. You can't dispute that there were no body cameras, right? There was no body camera. There was no body camera because, as there was undisputed evidence, none of these DART officers had cameras in September of 2018. They had them as of October 2018. Wasn't there some testimony that they should or officers were supposed to have at that point? There had been a pilot program and it was determined that the cameras weren't working as they should and that these particular group of DART officers did not have cameras. Can I ask you a question? So, you agree, I assume, that district courts can't weigh evidence at summary judgment? That they bit in the district court's opinion where it says that the incident reports are not, quote, on par with sworn statements made in a deposition. That sounds like quintessential weighing to me. I think, I disagree. What do you think that means? What do you think that means, not on par with? What does that mean? I think it means it's recognizing exactly what Judge Luck was discussing earlier. The fact that you don't, you have a limited amount of space in a report to put down your recollection of the incident and that's not the same as hours worth of testimony in a deposition where you're going through, step-by-step, exactly what happened. But so, I mean, I guess I take all of that, but how is that anything other than I've read this thing and I've read this thing. This one isn't as convincing to me as this thing is. I think it would be different if they were inconsistent, but they weren't inconsistent. It's just that one didn't mention one of many, many facts and one that was specific questions. But material inconsistencies are a basis for which to impeach and also, we've said, could create issues of summary judgment in the context of employment the first use of force at the moment that, or what happened at the moment of the initial use of force? No, I don't think so because he talks about the non-compliance and he's given the instructions. Let me ask you this, let's assume for the moment that we read the record in the light most favorable to your opposing counsel as him not having come at your client. Would the use of a taser be okay given everything that is undisputed at that point, that they were They warned him numerous times. They opened the cell, even pointed the taser at him. Please put on your clothes, continue refusal. Is the use of a taser at that point unreasonable under the law, both as a matter of established law and on its, as a matter of whether it's a constitutional violation? Based on that, even independent of whether the, Mr. May was coming at Officer Cook at that moment? Well, it's hard to say in a hypothetical vacuum, but Well, do your best. If the only thing is that, that he was not putting on his clothes when asked. Well, everything that happened. You know this case better than anyone here, or just about anybody here. You know everything that happened up to the point at which the cell is open and he employed the taser. Given all of that happened, does that establish, is that a sufficient justification for use of force? Not at that point, but every one of the officers, I mean, yes, Cook went first, but Jackson's behind him. He described Mr. May having his arms up and lunging forward. I mean, there's this semantics going on about aggressive stance, but the behavior that Jackson described certainly was threatening, and all of the officers described feeling threatened, and that they thought that there was a threat. All right, so just to continue Judge Locke's question, I mean, the district court, I think, said that the crucial fact was to step forward, right? And so, if everything else occurred, including an aggressive stance, naked guy, possibly masturbating, making an aggressive posture, but not stepping forward, is a taser okay? I think if it's an aggressive stance with a threat, yes, you're meeting a threat with a use of force that would be objectively reasonable. But I think that, I don't think that's what Jackson's testimony was. He was describing moving forward. Well, the question, but that sort of defeats the hypothetical. We're asking you, what about if there is no step forward? Or what about if we conclude that a reasonable jury could decide that there was no step forward? I mean, the officer doesn't have to wait for something to be a reasonable threat. He can meet that with objectively reasonable force. All right, so will you address for me as well my question about deliberate indifference in the standard? Yes. I think that the weight of the evidence, well, first of all, I don't think it's necessary to reach it in this situation, because as the district court acknowledged, there was, you would have, even if it were mere negligence, it would have satisfied the standard in this particular case. So you don't think it was even merely negligent to put him in the property room instead of take him to the infirmary? I apologize. You don't even think it's merely negligent to put him in the property room? Because first of all, if you're talking about the very beginning of this situation, the officers had no knowledge of any medical history, of any use of drugs, that sort of thing at the beginning. Once they become aware when he's unconscious, they immediately start acting. They take his pulse, they check the eyes, they immediately start getting him out of the restraints, and then begin CPR. And by then, the medical people are back, and they sort of rotate CPR. And so they weren't deliberately indifferent, and it would have met the merely negligent standard. In answer to your question, however, I think the weight of the evidence is in favor of the gross negligence standard. The weight of the case law, you mean? Yeah, the weight of the case law. I apologize. I don't know what I said. Okay, that's okay. Especially given the Ireland v. Frommel case, which in footnote 5 talks about how it acknowledges Farmer, which drew a distinction between reckless, that it had to be reckless when it talks about how to be this subjective element, and says that it's akin to gross negligence, but not always the same, and that this recklessness is the standard that's appropriate, that the Farmer court recognized. And in Ireland, that was acknowledged to be the appropriate standard as well, given Cottrell. So that seems to be, given the Farmer case, the proper standard would be the gross negligence. Okay, very well. Any more questions? Okay. Do you have any other questions? Thank you very much for your time. Mr. Mize, let's hear from you about NAFCARE. Thank you. Good morning, Your Honors. May it please the Court. David Mize here on behalf of EMT, Travis Williams, and NAFCARE, Inc. The issue before the Court, as Mr. Harper pointed out, is the issue of causation in a Georgia medical malpractice case. The trial court correctly pointed out that the experts for the plaintiff, the statements were general and conclusory and did not go to the specific standard of care acts alleged against the NAFCARE employees, and we'll go through those one by one. Mr. Harper dealt with the foreseeability aspect of the causation, and then he also says he can't have it both ways, or appellants can't have it both ways, where they argue that there's no case law on this because the additional restraints have never happened, that there's all these additional things that took place that caused the death, as the medical examiner and their pathologist said, but then also state that these additional things should have been foreseeable. With respect to the causation between the standard of care aspects, I think the easiest way to do that is break it down actor by actor. Dr. Hughes' conclusory just states that the NAFCARE employees should have done something earlier and doesn't get into the specific way that that ties into the specific standard of care. There are three NAFCARE employees who were involved on the day in question. Yeah, but this is not, you don't get to do what your co-counsel does with regard to the officers. We don't break it down that way. Your company's liable. It's liable for all of it. It's liable for things that it did do and it didn't do for people that were there and were not there. Fair, but the— No, that's the law. With respect to the standard of care, that still has to tie to the criticism. The criticism has to tie to the injury. So if you look at the criticism, there are no criticisms. Dr. Hughes has no criticisms about the practices or policies. He has criticisms about the medical providers and if you look at Mr. Williams, his criticisms are the communication relating to the intake. He's not critical of the decision that Mr. Williams made. He made only one decision. His decision is does this patient go back to Grady or go in to continue the intake process? He's not critical of that. He does not believe the patient should have been sedated at the time of this intake and he does not believe the patient should have been dated prophylactically. He has no criticisms of the nurses who were involved or the nurse who's involved in that care and he has one criticism about the PA who was involved at the time, which is PA, DDAs, who did not bring his equipment bag, but he also stated that that did not change the outcome. So that standard of care is gratuitous. It did not change the outcome. So the only standard of care criticism before the court on that is the communication related to Travis Williams and with the conclusory opinion that the medication should have happened earlier, he even states that at the time that the guards entered, it's a judgment call of whether to even sedate the patient at that point. There's no evidence in the record that the outcome was changed based on that communication. There has to be a specific thing that says because what Travis Williams did caused this outcome and he does not say that he should have been sedated at intake and he does not give a specific tie to that. It's a conclusory statement. Doesn't he say that it should have been communicated to medical professionals that he was suffering from a mental illness and was suffering or was under the influence of some narcotics at the time? That is the standard of care allegation, but there's no evidence that that would have led to a different intervention. Doesn't he also say that the failure to have done that and to have treated the Mr. May because of that, it was foreseeable that he would act up and that that would cause injury down the line? He does, but he does not say when the treatment should have occurred. And that's the problem with his statements. Before the use of force. I mean, that's the— That's not what he says. He says even at the time of use of force, it's a judgment call. But regardless, there is no evidence of any agitation before that. He does not know when the agitation begins and he does not say that sedation should have happened at 3. The sedation should have happened at 2.30. He says that the sedation should have just happened earlier. Does he not testify or does not say in his report, which is a 218-8, that quote that clinicians that NAVCARE collectively should be anticipatory of the possibility of deterioration in agitation and or violent detainees that are intoxicated with meth? He does say that, but he has to go beyond that and say this is when the standard of care violation was. Doesn't he also testify at his deposition that the deterioration could reach, quote, a point, quote, where there has to be a use of force, including chemical agents and electrical weapons? He does in hindsight say that, yes, that is a point, but he doesn't say when that should have occurred. I mean, he has to say that at this point, this is when the intervention should have happened. It seems like we're squinting pretty hard given the procedural posture, right? I mean, Georgia law makes it pretty clear that causation is not something that is decided at summary judgment. Georgia law makes it pretty clear that, you know, sort of that there's a superseding cause only when the alleged superseding cause is unrelated to the cause that sort of began the whole thing. It just seems like we're, boy, we're working pretty hard to say he's got to say this precise thing or else. Well, and that's exactly what the medical malpractice law says, is he has to be specific. I mean, if you look at the case, one of the cases that we cite, you know, Anderson v. Columbia County, that expert's causation testimony was excluded because it was not specific. It was just general, this should have happened before, but it doesn't go into it. You know, I would state that, you know, I may be wrong, but I tried to look at this yesterday, and I believe every case cited by both sides in this deals with the either affirmation or reversal of a summary judgment in favor of the defendants. All the case law cited by both sides deal with summary judgment on causation. There's one J&O v. case, and there's one new trial case, which would be a different standard. With respect to that, this is commonly decided in Georgia state courts that there's not causation. I mean, that's why we have this Weirin case. We need this medical expert testimony to give the link to the specific act, and it's just not here. And I'm over my time, so if you all have any questions, I appreciate your time. Okay. Very well. Thank you. Thank you very much, Mr. Mize. Mr. Harper, you've got your full three minutes remaining. Thank you, Your Honor. I just want to address a few issues here. The first one, regarding the taser, if Antonio May lunged toward the officer, it would be very difficult to tase him in the back, just to clarify that particular issue. And again, the video footage shows him going into that cell with his taser drawn immediately. So if Antonio May is coming toward him, it would be very difficult for him to get tased in the back, number one. Number two, Jackson did, in fact, have a body camera on. He contradicted this affidavit that was filed at summary judgment, was never produced in discovery about this policy they had during that time. Officer Jackson actually testified he had a camera, just wasn't working, so these guys violated the camera policy regarding credibility. Regarding the deliberate indifference, Antonio May did not go unresponsive after he came out of the shower area. They put him in front of the camera, once again, before he went unresponsive, to show that he was responsive. And then he goes unresponsive, and then they react to get the medical director, right? So what they should have done was taken him directly to— Doesn't something happen before that, though? They bring him in, and then I think it's 75 seconds later, one of the officers, and I forget who, leaves, brings in the PA, and the PA comes and does a visual inspection 75 seconds after he's brought into the property room, right? They go get the PA, they do, and every second matters. I've got to say, it's hard to find someone deliberately indifferent where they're actually getting the doctor. Well, I understand, but all I can argue is that the most expedient way to deal with issues is to take him to the doctor. Well, there's no doubt that they violated a policy here. I don't think that's a question here. But I don't know that we've ever said that that sort of negligence itself gets you, or a violation of policy gets you, to deliberate indifference. Is there any case where we've said that that alone— No, not that alone would do it. It just goes to the overall callous nature of how they treated Antonio May. But if that doesn't rise to the level of deliberate indifference for the court, it's understandable that that act alone. But it just, again, shows their mentality of not doing what's best for him. They were trying to protect themselves. I want to talk about the Arlen case in my few seconds left. You asked us to look at it. It's very different. In the Arlen case, there was a nurse there corroborating the step toward the officer. We didn't have anyone corroborating it in this case. In that case, the inmate died of organ failure, not force. In this case, he died directly because of the restraints, because of the restraints in violation of policy. And those restraints is what caused a grand jury to indict these officers for felony murder. We cannot have a precedent that allows officers to be charged and possibly convicted of murder but get off on qualified immunity. Thank you, guys. Okay, very well. Thank you both very much. That case is submitted, and the court will be in recess until tomorrow morning at 9 a.m.